Rockingham, ⎱
　June, 1897. ⎰

69　147
72　337

## CLARK *v.* PARSONS.

The statute of limitations does not run against a tenant in common of a remainder during the continuance of the life estate; and his cotenant, who also owns the life estate, cannot acquire title by adverse possession until after its termination.

A life estate will merge only to the extent of the life tenant's interest in the remainder.

A remainder-man who stands silent while a life tenant, believing he owns the fee, improves the estate, is not thereby estopped to assert his title after the termination of the life estate, when an examination of the records would have disclosed his interest.

BILL IN EQUITY, to remove a cloud upon the plaintiff's title to a parcel of land in Rye, of which the defendant by his answer claims to own an undivided half. Facts found by a referee. November 13, 1820, one Parsons conveyed the premises in question, with other land, to Amos S. Parsons by warranty deed. Amos had three sons, Joseph, James M., and Isaac D., and by his will, duly probated February 14, 1851, gave all his real estate, including the disputed premises, to Joseph for life, with remainder to James and Isaac. Isaac lived in Portsmouth and died at sea, leaving two sons, William R. and Lewis P.

December 14, 1865, Joseph and James conveyed a tract of land containing about three fourths of an acre, known as the "sea field," with other land (all being part of the land devised by Amos), to William Berry, and Berry entered into occupation of the premises and continued in occupation till April 3, 1868, when he conveyed the same to O. W. Trefethen. Trefethen occupied until September 2, 1871, when he conveyed the part called the "sea field" to Crosby and Henry Knox. In 1872, the Knoxes laid the "sea field" out into house lots and built a large house on the lot, the title to which is in issue in this action. December 5, 1872, Crosby Knox conveyed his interest in the "sea field," including the premises in question, to G. W. Stone, and April 2, 1873, Henry Knox conveyed his interest in the same premises to Stone, who occupied them until July 6, 1880, when he conveyed them to George H. Emery, who June 6, 1891, conveyed them to the plaintiff, who has occupied them ever since. All these conveyances were made by warranty deeds, duly recorded. None of the grantees, unless it was Berry, examined the records, and there was no evidence whether Berry did or not; each relied on the warranty in his deed.

April 15, 1876, Isaac's son William, and January 27, 1877, his son Lewis, conveyed by deed each all his interest or title to the lands of which Amos died seized to the defendant. Their deeds were immediately recorded. Joseph died December 20, 1891. Amos was seized of the "sea field" at the time of his death.

The defendant is seventy-seven years old, and was acquainted with the land and knew all about the title long before he purchased it in 1876 and 1877. He was about the place in 1872, saw a plan of the house to be erected thereon before it was built and the house while they were building it, and knew the Knoxes had laid the "sea field" out into house lots and were selling them and building houses thereon; but he never told them that their title was defective. In 1874, Stone built a stable, put up a tank, and laid out more than three hundred dollars on the premises. Emery made improvements while he owned the property to the extent of five or six hundred dollars. In 1881, the owners of the premises built additions to the house at a cost of twelve hundred dollars. In 1885, the owners of the "sea field," which included the lot in question, built a heavy stone wall upon that part of the field next to the seashore, at considerable expense. The defendant knew when the additions to the house were made and saw the work being done, but did not then, nor at any time thereafter during the life tenant's term, make claim upon or give notice to any occupant of the land that he owned or claimed to own any interest therein. He also knew, or ought to have known, of the construction of the wall.

After the defendant bought out Isaac's sons, he never claimed to any one until after the death of the life tenant that he owned one half of the land. At the trial, the defendant testified that he made no claim to the land until after the death of the life tenant, because counsel advised him it was unnecessary to do so.

Berry and his grantees have been in open, notorious, exclusive occupation of the premises since 1865, and have paid all taxes and insurance thereon. They had no actual notice of any adverse claim or of any defect in their title until after the death of Joseph in 1891, but believing the deed of Joseph and James conveyed a good title, expended their money relying thereon. The defendant either knew or ought to have known that the plaintiff was, and that his grantors had been, occupying the premises under a claim of exclusive ownership and without any actual knowledge of any adverse claim or defect in their title until after the death of the life tenant.

*Samuel W. Emery*, for the plaintiff.

*Calvin Page*, for Knox and Stones.

*William H. Sawyer*, for Stone.

*Frink & Marvin*, for the defendant.

*Sargent, Hollis & Niles*, for Emery. Upon the facts stated in the case, the only legal question to be determined is whether the defendant has a valid title to an undivided half of certain premises in Rye, consisting of a lot of land and dwelling-house thereon, which he can assert against the plaintiff. There are two conclusive reasons why the defendant cannot maintain his title. The first reason is that the plaintiff has a perfect title by adverse possession; and, second, the defendant, if he has any title, is estopped to make any claim of an interest in the premises as against the plaintiff.

I. Our contention is that the deed from James M. Parsons, one of the tenants in remainder, to William Berry, which was duly recorded and purported to convey the entire premises, coupled with the entry of William Berry into the possession of said premises under said deed claiming a title to said entire tract, amounted to an actual ouster of Isaac D. Parsons, the other tenant in remainder, and that the plaintiff and his grantors, including William Berry, having since that time occupied said premises openly, adversely, notoriously, and exclusively, they have thereby gained an absolute title to the premises as against any paper title which the defendant may have obtained from the heirs of Isaac D. Parsons.

A grantee by conveyance from one of two among several joint owners of land, after possession taken, holds adversely to the other joint owner. If one cotenant executes and delivers a deed of the entire estate, and the grantee causes the deed to be recorded and enters into possession, claiming title to the entirety, and openly exercises acts of ownership, this is a disseizin of the cotenants, and they cannot subsequently convey their portion of the estate by an effectual deed to a third person. It has also been held, where one of several tenants in common conveys the entire premises held in common, and the grantee enters into possession under the conveyance claiming title to the whole premises, that such possession is adverse to the cotenants of the grantor. Busw. Lim. & Adv. Poss., *ss.* 296, 300. Where one cotenant assumes to convey the entire land and does convey by metes and bounds, his deed will give color of title; and if possession is taken thereunder, the purchaser claiming title to the whole premises, it will amount to an actual ouster and disseizin of the other cotenants, and such possession is adverse, and if continued for a sufficient length of time, will bar the right of the other cotenants to recover. *Forest v. Jackson*, 56 N. H. 357. Proof of a verbal sale of the interest of one of the heirs to an es-

tate to another of the heirs, followed by adverse possession for twenty years by such other heir, has been held to create a sufficient title in the latter. *Hyne* v. *Osborn*, 62 Mich. 235. See, also, *Watson* v. *Jeffrey*, 39 N. J. Eq. 62; *Lapeyre* v. *Paul*, 47 Mo. 586; *Sydnor* v. *Palmer*, 29 Wis. 226.

Our claim is, that more than twenty years having elapsed since the plaintiff's predecessors in title went into possession of the premises, under a deed purporting to convey a clear title, whatever rights the defendant or his grantors may have had are now forever barred. The decision of this court in *Walker* v. *Walker*, 63 N. H. 321, is conclusive upon this point, whatever construction is put upon the transaction between Joseph and James M. Parsons and William Berry. That decision, the result of the most profound research on the part of the late chief justice of this court, and embodying and declaring in the clearest terms the salutary principle that for every legal wrong there must be a legal remedy, carries so great weight, not only because it is a statement of the doctrine of this same court, expounded by the highest authority, but also because of its intrinsic merit, that it is hardly to be believed that the court will make such haste to undo the work of Judge *Doe*, or will announce at this late day the principle that there are legal wrongs for which the supreme court of New Hampshire will afford no legal remedy.

This case, however, does not depend in any degree upon the decision in *Walker* v. *Walker*, although we think that case is conclusive against the defendant's claim, so far as it rests upon the theory that Berry, by the conveyance to him, became purchaser of Joseph's life tenancy, and occupied the premises in that capacity until the death of Joseph. We think that this theory is incorrect, and that Berry and his successors never occupied the premises in the capacity of tenants for the life of Joseph, but that they occupied as tenants in common, claiming the whole. Berry, by his purchase from Joseph and James M., became a tenant in common in fee, as well as the holder of the life estate, and the legal effect of this situation, manifestly according with the intention of the parties, is that the life estate was from the moment of the conveyance merged in the greater estate and extinguished. To express it in another way, the effect being the same, Joseph did not intend to grant or transfer, but rather to surrender, the life estate. The life tenant, by joining with one of the tenants in common in remainder in the conveyance by warranty deed, intended to surrender and extinguish the life estate, not to provide for its continuance in Berry; and Berry clearly did not intend to become the purchaser and tenant of the life estate, nor yet to purchase a fee from the life tenant. The natural construction of the transaction, as viewed by him, must be that he purchased the fee from James M., who he believed

had authority to convey it, and, in order to get immediate possession, bought out the life tenant. His taking a conveyance from James M. shows conclusively that he did not consider Joseph as qualified to convey the fee, and that his occupation, claiming a fee, was supposed to be under James M. This is very different from the common case of a conveyance in fee by a life tenant alone, where the grantee's only claim must be under the life tenant. The whole transaction shows that the intention of the parties was to effect an extinguishment, not a transfer, of the life estate. That being so, the life estate was extinguished, Berry went into possession as a tenant in common, claiming the whole, under a deed purporting to convey the whole, and a right of entry at once accrued to his ousted tenant in common. That right of entry is now barred by the lapse of more than twenty years, during which the tenant in common has remained so ousted, and Berry and his successors have been in open and notorious adverse possession. The circumstances lead necessarily to the conclusion that the life interest was extinguished from the moment of the conveyance to Berry, as the result of a surrender by the life tenant, or of a merger, following, by operation of law, upon the conveyance, by whatever name that conveyance is called.

" A surrender is the yielding up of an estate for life or years to him who has an immediate estate in reversion or remainder, wherein the estate for life or years may drown (merge) by mutual agreement." Co. Lit. 337 b. " Merger bears a very near resemblance, in circumstances and effect, to a surrender; but the analogy does not hold in all cases, though there is not any case in which merger will take place, unless the right of making and accepting a surrender resided in the parties between whom the merger takes place. To a surrender, it is requisite that the tenant of the particular estate should *relinquish* his estate in favor of the tenant of the next vested estate, in remainder or reversion. But merger is confined to the cases in which the tenant of the estate in reversion or remainder *grants* that estate to the tenant of the particular estate, or in which the particular tenant grants his estate to him in reversion or remainder. Surrender is the act of the party, and merger is the act of the law." 4 Kent *100.

A surrender may.be made to one of two joint tenants or tenants in common, in remainder or reversion, and enures to both, so that after such surrender the question whether the possession of him to whom the surrender is made is adverse to his cotenant depends upon the same considerations that govern in determining the same question when it arises between cotenants generally. " A surrender to one joint tenant shall enure to them all. But if tenant for life or years grant his estate to one of the joint tenants in reversion, it seems this shall not enure as a sur-

render to them all, but as a grant to him alone." Shep. Touch. 303. "And so it is if such a lessee for life should surrender to one of them, it shall enure to them both, for that they have a joint reversion. But if the lessee grant his estate to one of them, no part of it shall enure to his companion, because for the moiety belonging to his companion it is in *esse* in him to whom the grant is made, the reversion to the other in fee." Co. Lit. 192 a and b. It will be noted that the distinction is here made between a surrender and a grant. Whether any particular conveyance is a surrender or a grant, is a question of fact depending upon the intention of the parties, and not upon the form of words used. "A surrender, *sursumredditio*, or rendering up, is of a nature directly opposite to a release; for as that operates by the greater estate descending upon the less, a surrender is the falling of a less estate into a greater. It is defined, a yielding up of an estate for life or years to him that hath the immediate reversion or remainder, wherein the particular estate may merge or drown, by mutual agreement between them. It is usually done by these words, 'surrender, grant, and yield up,' though no special form of words is essential." 1 Broom & H. Com. *520.

*Farmer* v. *Rogers*, 2 Wils. 26, is a good illustration of this doctrine. The plaintiff mortgaged the premises to the defendant for 500 years, with a proviso that the term should cease upon payment of £500 upon a certain day. After that day the plaintiff paid the defendant the sum named, and the defendant wrote on the mortgages, "I do release the said A. B. and discharge the within mortgaged premises from the term of 500 years." It was argued by the plaintiff that "the word surrender is not necessary to make a surrender, but any other words tantamount will be sufficient; as if lessee for life say to the lessor that he grants that he shall enter into the land, and that he is willing that he shall have the land." It was held by the court "that the words 'release and discharge the term of 500 years,' are much stronger than words which, in many cases, have amounted to a surrender, *ut res magis valeat quam pereat*."

It will thus be seen that no particular form of words need be used, that the word surrender is entirely unnecessary, and that the word grant may be used without taking from the transaction its character as a surrender, and making it a grant. The object to be attained is, "*ut res valeat*,"—that is, that the transaction shall take effect as intended. Unless, therefore, the court is clearly of the opinion that Berry, in taking a deed from the life tenant and the only resident and known remainder-man, intended to maintain the character of a life tenant during the life of Joseph, and not to enter upon his possession as tenant in fee until after Joseph's death, it must be held, in accordance with the intention of the parties, that there was a surrender of the

premises, enuring to the benefit of both remainder-men, and giving an immediate right of entry to the ousted cotenant, which right has now been lost by the failure to take advantage of it for a period of more than twenty years.

But even if the conveyance were deemed to be a grant rather than a surrender, there would still be a merger by operation of law. A merger will take place when an inferior and a superior estate coincide in one person, if he be in such a position that, as holder of the superior estate, the inferior might be surrendered to him. The primary test of a merger is found in the question whether the person in whom the two estates coincide might, if he were tenant of the superior estate alone, accept a surrender of the inferior. There can be no doubt that a joint tenant in remainder is capable of receiving a surrender from the tenant for life. Accordingly, it follows that when the two estates coincide in him, however they may have been acquired, there is a merger, and the inferior estate is at once annihilated. At law, this follows as a necessary conclusion; at equity, the result is the same, unless it is clear that the parties intended that no merger should take place, or unless substantial injustice would be done by giving to the transaction its usual effect.

"At law, when a greater and lesser, or a legal and equitable estate coincide in the same person, the lesser or the equitable estate is immediately merged and annihilated. But this rule is not inflexible in equity; whether or not a merger takes place depending upon the intention of the parties and a variety of other circumstances. Notwithstanding the technical rule of law, equity will prevent or permit a merger as will best subserve the purposes of justice and the actual and just intention of the parties; and in the absence of an expression of intention, if the interest of the person in whom the several estates have united, as shown from all the circumstances, would be best subserved by keeping them separate, the interest will ordinarily be implied. But where it is a matter of indifference to the party, the technical rule applies and the merger will take place. So an agreement that there shall be no merger will be respected in equity when consonant with the equitable rights of all concerned. The intent of the parties, however, in order to control the question of merger, must have been an intent existing at the time the two estates came together; if no such intent then existed, a merger cannot be prevented by an intention afterwards formed and expressed, or by subsequent circumstances from which such intention might have been inferred, had they existed at the time of the union. A merger will be prevented by equity only, however, for the purpose of promoting justice; it will not prevent a merger where such prevention would result in carrying a fraud or other conscientious wrong into effect." 15 Am. & Eng. Enc. Law 314, and cases cited.

There was, then, a merger by operation of law, effective both at law and in equity. It is effective at law, because there was a union of the life estate and the remainder in one person, whose estate in remainder was of such a character as to permit of his receiving a surrender from the life tenant had he been in possession of the superior estate alone. It is effective in equity, because the referee has not found that there was at the time of the conveyance any intention to prevent a merger: because there is nothing in the case from which the court can find as matter of law that the referee ought to have found such an intention; because every thing in the case goes to prove conclusively that there was no such intention; and because it is not necessary, for the promotion of justice, that the merger should be prevented, but, on the contrary, every consideration of justice and equity requires that the merger should be upheld, and the defendant's fraudulent intentions frustrated.

II. The defendant by his acts and conduct is estopped to set up any title to the premises as against the plaintiff. Having full knowledge of the occupation of the plaintiff's grantors from and before the time of the purchase by William Berry, and full knowledge that Berry and his grantees relied upon their title supposing it to cover the entire premises; knowing that the Knoxes, who owned the premises from September, 1871, to December, 1872, were cutting up the "sea field" and selling house lots therefrom; that Stone, who was the owner from 1873 to 1880, erected buildings and made other improvements thereon at a large expense; and that Emery, who was owner from 1880 to 1891, also made valuable improvements at a large expense, he deliberately and willfully concealed the fact that he or any one else had even a pretended claim to any portion of the premises, and allowed these parties to go on and spend their money to purchase and increase the value of the same without giving them any information of these material facts within his knowledge, or warn them in any way against making a sale or purchase. It appears that although the defendant acquired his title from the sons of Isaac D. Parsons in 1876 and 1877, he never claimed to any one until after 1891 that he or any one else had any interest in the premises; and during this time George H. Emery purchased from W. G. Stone, and conveyed to the plaintiff. It is manifest that the defendant knew all about these conveyances, and from his proximity to and acquaintance with the land in question he must have known that these conveyances were about to be made before they were actually made; yet he quietly stood by and concealed from Emery and the plaintiff the facts which would have protected them and prevented the expenditure of their money if such facts had come to their knowledge.

Upon this branch of the case the law seems to be perfectly

clear, and there are numerous authorities directly in point in principle, although there is scarcely one of them where the facts show such a malevolent purpose on the part of the person against whom the estoppel was claimed as appears in this case. If a party is present and sees another sell and convey property, whether real or personal, to which he may assert a title, without disclosing his title, or objecting to the sale or conveyance, and the sale is made with a full knowledge on his part, he will be estopped by his silence from thereafter setting up his title against the purchaser. And this principle may be carried out at common law without resort to equity. *Corbett* v. *Norcross*, 35 N. H. 99. " A representation which estops the party making it from denying its truth, must not only have misled the party to whom it was made, but have been intended so to mislead him, or at least there must have been such culpable negligence or carelessness as may be regarded as amounting to an intention to mislead. The same is true where a party by his silence — which is one mode of making a representation — has misled another as to the matter not communicated. . . . If one having the title to an estate, and knowing it, stand by and see another, who, ignorant of it, purchased the estate, and suffer him to improve it under the belief that his title is valid, such an one is bound by the sale, and cannot invoke the aid of a court of justice to dispute it. ' Standing by ' may not import actual presence, but implies knowledge under such circumstances as to render it the duty of the possessor to communicate it." *Richardson* v. *Chickering*, 41 N. H. 380, 385, 386.

" To create an estoppel by silence, there must be not only the opportunity, but the apparent duty, to speak. The party keeping silence must know that some one is relying thereon, and is either acting or about to act as he would not if the truth were known to him." *Allen* v. *Shaw*, 61 N. H. 95, 97. The whole gist of the doctrine of equitable estoppel, based on silence, is summed up in the words last quoted. There is an estoppel when one has kept silence, although he knew that by speaking he could prevent some action on the part of another which that other would not take if aware of that which the party keeping silence might announce. His reasons for keeping silent are of no consequence. If he made a mistake as to his rights, and believed that he could safely lie by and reap the benefits of another's expenditures, he is the one who must suffer the consequences of that mistake. And if he consulted an attorney and was wrongly advised, he must seek such redress as is open to clients whose counsel make mistakes. He certainly cannot equitably demand that the plaintiff should be made to suffer for his or his attorney's erroneous conceptions of the extent to which the law would countenance his unconscionable deception.

. The defendant's knowledge of the extensive improvements made on the property by parties, who, as he knew, occupied the premises in the full belief that they had a clear and complete title to them, made it incumbent upon him either to inform them at once of his claim of ownership, or never thereafter to urge that claim. The estoppel is complete, and is an effectual bar to the assertion by the defendant of any rights in the property whatever. This alone is decisive of the case, so far as this plaintiff is concerned.

WALLACE, J. The plaintiff has not acquired title to the premises by adverse possession as against the defendant, nor did the statute of limitations begin to run against an action for possession until the death of the life tenant, Joseph, in 1891. *Foster* v. *Marshall*, 22 N. H. 491; *Bodwell* v. *Nutter*, 63 N. H. 446, 448; *Mixter* v. *Woodcock*, 154 Mass. 535.

But it is urged that Isaac or his sons might, at any time after the deed to Berry by Joseph and James, December 14, 1865, have maintained an action to establish their title to the remainder according to the doctrine of *Walker* v. *Walker*, 63 N. H. 321. That case only gives the remainder-man the right to establish his title when it is questioned. It is a right of which he may avail himself, or not, as he may elect. If he does avail himself of it and the controversy is decided in his favor, it gives him no right to the possession or to a writ of possession during the existence of the life estate. Until the termination of the life estate no right of entry or right of possession exists in favor of the reversioner. Until the right of entry and the right of possession to the property accrue, the statute of limitations does not begin to run against an action for the possession.

It is claimed that when the life estate and the estate of one tenant in common of the remainder were granted to Berry, a merger of the life estate in the fee was effected by the coincidence of the two estates in one person, and that the life estate in the entire property was thereby extinguished. It is a sufficient answer to say that the life estate in the undivided half of the remainder belonging to Isaac could not merge in the undivided half of the remainder belonging to Berry; neither could the conveyance of the life estate to Berry, construed as a surrender, enure to the benefit of Isaac or those who claim under him. "Merger is coextensive with the interest merged, as in the case of joint tenants and tenants in common; and it is only to the extent of the part in which the owner has two several estates. An estate may merge for one part of the land and continue in the remaining part of it." 4 Kent *100, *101; *Clark* v. *Clark*, 56 N. H. 105, 113; *McLaughlin* v. *McLaughlin*, 80 Md. 115.

Another question which arises is whether the defendant is estopped by his silence to assert his title to the land in question. The general principle of estoppel *in pais* is, that where one by his words, conduct, or silence " causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is precluded from averring against the latter a different state of things, as existing at the same time." *Pickard* v. *Sears*, 6 A. & E. 469; *Corbett* v. *Norcross*, 35 N. H. 99; *Richardson* v. *Chickering*, 41 N. H. 380; *Horn* v. *Cole*, 51 N. H. 287; *Stevens* v. *Dennett*, 51 N. H. 324; *Allen* v. *Shaw*, 61 N. H. 95. It is essential to the application of this principle that the party setting up the estoppel be ignorant of the truth of the matter in regard to which he claims he has been misled, and induced to act to his injury by the conduct or silence of the party to be estopped. If he was fully acquainted with the facts of the case, there would be no estoppel. In respect to the title to real estate, if the party claiming the estoppel is acquainted with the true state of the title, or has an equal means with the other party of ascertaining it, as in the case of a duly recorded deed, there will be no estoppel, at least from mere silence. *Odlin* v. *Gove*, 41 N. H. 465, 477; *Wood* v. *Griffin*, 46 N. H. 230, 237; *Allen* v. *Shaw*, *supra*; *Jones* v. *Aqueduct*, 62 N. H. 488; *Brant* v. *Iron Co.*, 93 U. S. 326, 337.

The plaintiff claims that the defendant is estopped to assert title to the premises, because after he acquired the title he remained silent while the plaintiff made some permanent improvements. The situation of the title was shown by the records, and the information in regard to it was equally open to both parties. Although the plaintiff and those under whom he claims had no actual knowledge of the defect in their title, they had by the records constructive notice of it. Their failure to examine the records was not caused by anything said or done by the defendant. They might and should have informed themselves as to the title of the premises before purchasing or making permanent improvements. Their failure to do so was their own fault, and they cannot resort to an estoppel based upon the defendant's silence to avoid the consequences of their own negligence.

It is not found, nor does it appear, that the plaintiff will be injured by the defendant's assertion of his title. Upon partition of the entire common property, it may be that the defendant's share can be assigned to him without affecting the plaintiff's title to his improvements. *Holbrook* v. *Bowman*, 62 N. H. 313, 320, 321. Whether the plaintiff can or cannot avail himself of the betterment law, is a question not considered.

*Judgment for the defendant.*

All concurred.