2008 OK CIV APP 107

**MEDICINE LODGE INVESTMENTS, L.L.C., an Oklahoma limited liability company, Plaintiff/Appellant,**

v.

**EAR, INC., an Oklahoma corporation; and Richard D. Stansberry, an individual, Defendants/Appellees,**

**and**

---

Deer Creek Water Corporation,[1] an Oklahoma non-profit corporation, Defendant/Substituted Plaintiff/Appellant,

and

Carolyn Ayers, an individual, Defendant.

No. 105,204.

Court of Civil Appeals of Oklahoma, Division No. 3.

Aug. 15, 2008.

Certiorari Denied Nov. 24, 2008.

1. By this court's August 6, 2008 Order, Deer Creek Water Corporation was substituted as Plaintiff/Appellant in this case.

**504**

Tom E. Mullen, Fenton, Fenton, Smith, Reneau & Moon, Okahoma City, OK, and James P. Kelley, Kelley, Kelley & Gregory, Oklahoma City, OK, for Plaintiff/Appellant Medicine Lodge, L.L.C.

Robert A. Jackson, Jackson, Hall & Associates, Oklahoma City, OK, for Defendants/Appellees EAR, Inc., and Richard D. Stansberry.

Steven M. Harris, Michael D. Davis, Doyle, Harris, Davis & Haughey, Tulsa, OK, for Defendant/Substituted Plaintiff/Appellant Deer Creek Water Corporation.

KENNETH L. BUETTNER, Presiding Judge.

¶ 1 Plaintiff/Appellant Medicine Lodge Investments, L.L.C. (Medicine Lodge) appeals from the denial of its Motion for New Trial, filed after the trial court granted summary judgment in favor of Defendants/Appellees EAR, Inc., Richard D. Stansberry (collectively, Appellees), Defendant Carolyn Ayers, and Defendant/ Substituted Plaintiff/Appellant Deer Creek Water Corporation (Deer Creek).[2] After EAR conveyed real property to Medicine Lodge, a dispute arose over whether the conveyance included water rights. Medicine Lodge filed suit to quiet title to the water rights. Appellees claimed that the water rights had been severed and were not conveyed with the surface. Medicine Lodge countered that a portion of the water rights and the surface were each conveyed to Stansberry, EAR's predecessor in title, who conveyed all of his interest to EAR by quitclaim deed. Deer Creek asserted that the water rights and surface estate merged when both were owned by Stansberry. Medicine Lodge contended that because its deed from EAR did not reserve the water rights, they were included in the conveyance. The trial court found in favor of Appellees and later denied Medicine Lodge's Motion for New Trial. The record shows a dispute of material fact of whether the Warranty Deed to Medicine Lodge failed to reserve the water rights based on mutual mistake. We reverse and remand for trial.

2. The summary judgment order stated that it denied "Medicine Lodge's Motion for Partial Summary Judgment and granted EAR's and Stansberry's Motion for Partial Summary Judgment." EAR's and Stansberry's motion was actually styled Counter–Motion for Summary Judgment. The Oklahoma Supreme Court issued an order to show cause directing Medicine Lodge to show that the order disposed of all the parties and claims. (Supreme Court Order, November 1, 2007). The Oklahoma Supreme Court later issued its order recognizing that the summary judgment order disposed of all claims in this case and was therefore a final, appealable order. (Supreme Court Order, November 29, 2007).

We refer to EAR and Stansberry collectively as Appellees because Deer Creek's Response to Petition in Error indicates Deer Creek's position is that Medicine Lodge owns the water rights disputed here, Deer Creek has been substituted as Plaintiff/Appellant, and Ayers has not filed a responsive pleading in the appeal.

¶ 2 The record reveals that in 1977, Walter Sitlington, then owner of 160 acres,[3] entered a Water Rights Agreement with Deer Creek.[4] The Agreement was filed and recorded January 21, 1980.

¶ 3 In 1979, Sitlington conveyed the quarter-section to J. Craig Ayers and Patricia L. Ayers. The July 2, 1979 Warranty Deed from Sitlington to the Ayerses provided that it was "subject to Water Rights Agreement dated June 29, 1977 between (Sitlington) and (Deer Creek), but hereby conveying to (the Ayerses), all of (Sitlington's) right, title and interest under said agreement." The Ayerses and Deer Creek entered an Amendment to the Agreement in 1980.[5]

¶ 4 In 1992, J. Craig Ayers and Carol Ann Ayers [6] conveyed 54.28 acres of the 160 acres to Stansberry. The December 23, 1992 Warranty Deed to Stansberry provided that it conveyed "surface rights only" and that it was "subject to easements restrictions (sic) and mineral reservations of record." On the same date, J. Craig Ayers and Carol Ann Ayers executed a Mineral Deed conveying to Stansberry 39% of all water rights in and to the full quarter-section covered by the Water Rights Agreement.[7] The Warranty Deed and Mineral Deed were each recorded December 31, 1992. The Ayerses retained 105.72 surface acres as well as 61% of the water rights in the full quarter-section.

¶ 5 By Quit Claim Deed dated April 21, 1994, Stansberry conveyed his interest to EAR, a family corporation of which Stansberry is president. The deed provided that Stansberry conveyed *all* his interest in the described 54.28 acres and it contained no reference to, nor reservation of, mineral or water rights.

¶ 6 Ten years later, EAR conveyed a portion of the property to Medicine Lodge by Warranty Deed dated July 28, 2004. The deed excepted from the conveyance "covenants, conditions, easements, restrictions and mineral, (sic) reservations or conveyances of record."

¶ 7 In its Petition, filed August 9, 2005, Medicine Lodge claimed it was the owner of 39% of the water rights in the property described in its Warranty Deed from EAR.[8] Medicine Lodge asserted further that Deer

**3.** Described as the SE/4 of Sec. 18–14N–3W in Oklahoma County.

**4.** The Agreement granted Deer Creek an easement for wells and well houses, and the right to drill two water wells on the property. In the Agreement, Sitlington transferred all rights and interests, except for his own personal stock and domestic use, in the water under the quarter-section to Deer Creek. Sitlington agreed to "obtain legal use of the water rights through proper proceedings before the Oklahoma Water Resources Board, . . . ." The Agreement gave Deer Creek the right to take water from the property for the use of Deer Creek's customers and provided for payment to Sitlington for the water removed (the greater of $.05 per 1,000 gallons or $1,600, per year). The term of the Agreement was forty years unless Deer Creek abandoned or terminated the Agreement before that time. The Agreement provided that it was binding on the parties' successors.

The Agreement is binding on whomever holds title to the water rights subject to the Agreement. The issue in this case is which party owns title to the water underlying the quarter-section.

**5.** The document titled Amendment to Water Rights Agreement contains no date other than 1980 and it is unsigned. The amendment provided that it was entered in order to obtain an FHA loan. The amendment changed the term of the Agreement to 43 years from June 29, 1977 and changed the requirement for notice of termination of the Agreement.

**6.** Although it has no relevance to this dispute, for clarity we note the deeds suggest J. Craig Ayers was married to Patricia L. Ayers at the time Sitlington conveyed the property to them in 1979, but he was married to Carol Ann Ayers at the time they conveyed the property to Stansberry.

**7.** Exhibit 4 to Deer Creek's response to Medicine Lodge's Motion for Partial Summary Judgment is a document titled "Addendum to Contract" dated November 6, 1992. The addendum was signed by J. Craig Ayers, identified as Seller, December 21, 1992 and was signed by Stansberry, identified as Buyer, December 22, 1992. The addendum was not signed by Carol Ann Ayers, nor was it notarized. The addendum provides "(i)t is hereby agreed that 39% of the water rights will be transferred to the Buyer. All other mineral rights will be retained by the Seller. Subject to the contract on water rights with Deer Creek . . ."

**8.** Medicine Lodge later filed an Amended Petition changing only the metes and bounds description of the property to match the description in the Warranty Deed.

Creek had failed to pay Medicine Lodge as required by the Water Rights Agreement. Medicine Lodge averred that EAR, Stansberry and Ayers claimed some part of the water rights which clouded Medicine Lodge's title. Medicine Lodge asked for judgment quieting its title to the fee simple interest in the surface and water rights under the deed from EAR.

¶ 8 Appellees answered jointly. They asserted that the water rights had been severed from the surface and were not conveyed to Medicine Lodge. Appellees further claimed that EAR did not have title to the water rights to convey to Medicine Lodge and that EAR's Warranty Deed to Medicine Lodge excluded mineral reservations or conveyances of record. Curiously, though, they also asserted "(c)learly (EAR) and (Stansberry) claim ownership of 39% interest in the water rights pursuant to the water rights agreement and subsequent conveyance to these Defendants of the water rights." Appellees asserted that Medicine Lodge purchased the surface only and that Medicine Lodge was attempting to interfere with their contractual rights under the Water Rights Agreement. Appellees claimed that Medicine Lodge was seeking rights under the Agreement, rather than title to the water underlying the quarter-section.

¶ 9 Medicine Lodge filed its Motion for Partial Summary Judgment February 16, 2006. It listed one undisputed fact: EAR conveyed certain property to Medicine Lodge by Warranty Deed July 28, 2004, and the deed did not reserve any water rights owned by EAR. Medicine Lodge argued that a deed which does not reserve the water rights conveys the water rights. It further argued that the language in its Warranty Deed excepting mineral conveyances of record did not constitute a reservation of water rights.

¶ 10 Deer Creek responded that it had no interest in the water rights ownership dispute (except to preserve its rights under the Water Rights Agreement), but it asked the court to enter summary judgment in favor of Medicine Lodge.[9] Medicine Lodge filed a Reply in which it acknowledged that the water rights it claimed were subject to the Water Rights Agreement.

¶ 11 Appellees filed a Response and Opposition to the Motion for Partial Summary Judgment and Counter–Motion for Summary Judgment. They disputed Medicine Lodge's assertion that the Warranty Deed from EAR transferred "any severed contractual water rights." In addition to the facts listed above regarding the conveyances from Sitlington to the Ayerses and then to Stansberry, Appellees asserted it was undisputed that the Mineral Deed by which the Ayerses conveyed 39% of the water rights to the quarter-section to Stansberry "severed the water rights to the land purchased by Dr. Stansberry;" that "(b)ecause the water rights had previously been transferred by the Mineral Deed (to Stansberry) . . ., the Quit Claim Deed by which the transfer was effected [to EAR] made no mention of the water rights;" that Stansberry purchased the water rights for the use of his family at their home;[10] that Medicine Lodge and Stansberry agreed the purchase price for the property did not include the Water Rights Agreement and Medicine Lodge's agent met with Stansberry

---

9.  Deer Creek had previously filed a separate Answer in which it did not admit or deny Medicine Lodge's claims, but it asked for judgment against Medicine Lodge and in its favor. In its Response to Petition in Error, Deer Creek asserted that Medicine Lodge "is the owner of all water rights related to the 55 acre tract, which constitutes 39% of the water rights to the entire 160 acre tract." The record does not show that Medicine Lodge is the owner of the 55 acre tract. The descriptions of the property conveyed to EAR and from EAR to Medicine Lodge differ, and EAR claims it conveyed 40 acres, out of its 54.28 acres, to Medicine Lodge. Additionally, 39% of the quarter-section is 62.4 acres rather than 54.28 acres. Medicine Lodge sought to quiet title to 39% of the water rights related to its 40

acres. The Warranty Deed from EAR to Medicine Lodge describes the property in metes and bounds, but it does not state the number of acres conveyed.

10.  While the purpose of Stansberry's purchase of the water rights is not relevant to this dispute, we note that if Medicine Lodge prevails, Stansberry will continue to hold title to 39% of the water rights in 105 acres and EAR would continue to hold title to 39% of the water rights in 15 acres. Additionally, "any landowner has a right to take groundwater from land owned by him for domestic use without a permit." 82 O.S.2001 § 1020.3.

"sometime in the winter of 2003" and the agent stated Medicine Lodge "did not need" to acquire an interest in the Water Rights Agreement at additional cost; that EAR entered two agreements in 2004 to sell the property to a developer but both fell through because the wells on the property left too little room for the desired number of homes; that EAR's Warranty Deed to Medicine Lodge excepted covenants, conditions, easements, restrictions and mineral reservations or conveyances of record which "obviously included the December 23, 1992 Mineral Deed, . . .;" that EAR did not own the water rights and could not have conveyed them to Medicine Lodge; that Medicine Lodge obtained a mortgage on the property July 28, 2004, and the mortgage included an Exhibit B which specifically referenced the Water Rights Agreement and the commitment for title insurance listed the effect of the Water Rights Agreement as an exception; that Medicine Lodge asked Deer Creek to provide utility services to a proposed development, to which Deer Creek responded that the water rights must be transferred to Deer Creek at no cost to Deer Creek; and that Medicine Lodge filed this suit because it could not transfer the water rights to Deer Creek.

¶ 12 Appellees argued that because the water rights were conveyed to Stansberry by a separate Mineral Deed, they necessarily were not included in the Quit Claim Deed Stansberry later gave to EAR, and were likewise not included in the Warranty Deed from EAR to Medicine Lodge. They further argued that the Warranty Deed to Medicine Lodge excepted "conveyances of record," and they asserted the Mineral Deed from the Ayerses to Stansberry was a conveyance of record.

¶ 13 Medicine Lodge objected to Appellees' Counter–Motion for Summary Judgment. Medicine Lodge asserted that Appellees' statement of undisputed facts included inadmissible parol evidence purporting to modify or interpret the deeds. Medicine Lodge did not expressly dispute Appellees' assertion that Stansberry met with Medicine Lodge's representative and discussed whether the sale included water rights. Medicine Lodge asserted that statement was inadmissible parol evidence. Medicine Lodge repeated its argument that because a deed which does not reserve the water rights conveys those rights, then the Warranty Deed to Medicine Lodge included the water rights. Medicine Lodge also argued that Appellees had confused the contractual Water Rights Agreement with title to the water rights subject to the Agreement.

¶ 14 Deer Creek also opposed Appellees' Counter–Motion for Summary Judgment. Deer Creek argued that even if the water rights had been severed by the Mineral Deed, they merged with the surface estate when both were owned by Stansberry. Deer Creek argued that the Quit Claim Deed from Stansberry to EAR conveyed all of Stansberry's interest, which included the water rights because the Quit Claim deed conveyed all of Stansberry's "right, title, and interest, . . . together with all and singular hereditaments and appurtenances thereto belonging. . . ." Deer Creek also argued that the exception in Medicine Lodge's Warranty Deed for mineral reservations or conveyances of record did not result in a reservation of the water rights because the water and surface estates had merged when both were conveyed to Stansberry. Therefore, according to Deer Creek, the water rights were included in the Quit Claim conveyance to EAR, so that the Mineral Deed was no longer an existing conveyance of record.

¶ 15 The trial court found that "the issue with regard to the ownership of the water rights in question must be found in favor of the Defendants." The court granted Appellees' Counter–Motion for Summary Judgment and denied Medicine Lodge's Motion for Partial Summary Judgment. The trial court later denied Medicine Lodge's Motion for New Trial.

¶ 16 Summary judgment proceedings are governed by Rule 13, Rules for District Courts, 12 O.S.2001, Ch. 2, App.1. Summary judgment is appropriate where the record establishes no substantial controversy of material fact and the prevailing party is entitled to judgment as a matter of law. *Brown v. Alliance Real Estate Group*, 1999 OK 7, 976 P.2d 1043, 1045. Summary judgment is not

proper where reasonable minds could draw different inferences or conclusions from the undisputed facts. *Id.* Further, we must review the evidence in the light most favorable to the party opposing summary judgment. *Vance v. Fed. Natl. Mortg. Assn.,* 1999 OK 73, 988 P.2d 1275.

¶ 17 The record and pleadings reveal confusion between property rights in the form of title to the water underlying the surface and contractual rights under the Water Rights Agreement, which is in the nature of a mineral lease. More importantly, however, the record shows disputed facts requiring trial. The dispute is whether EAR's conveyance of 40 acres to Medicine Lodge included 39% of the water rights associated with those 40 acres. While the effect of deeds is normally a question of law, the record here provides some evidence requiring trial of whether there was a mutual mistake of fact requiring reformation of the deed to Medicine Lodge.

¶ 18 Appellees contend that the water rights were severed and that Stansberry did not convey the water rights in the Quit Claim Deed to EAR. The owner of land owns the water flowing underneath it. 60 O.S.2001 § 60. Water rights are conveyed with the surface unless they are specifically reserved. *Mack Oil Co. v. Laurence,* 1964 OK 39, 389 P.2d 955, 961; *Palmer v. Campbell,* 1958 OK 271, 333 P.2d 957, 959; 16 O.S.2001 § 29. The effect of this rule is that if water rights can be reserved from a conveyance of the surface, they can be severed from the surface in the way that oil, gas, timber and other valuable commodities can be. However, water is not included in a blanket reservation of minerals. *Mack Oil, supra.*[11] Instead, intent to sever water rights must be specifically expressed. In general, there must be express intent to sever water rights from land because a conveyance of land with attached water rights conveys the water rights

unless there is an express reservation. *Margrave v. Dermody Properties,* 110 Nev. 824, 878 P.2d 291, 293 (Nev.1994); *Rennard v. Vollmar,* 977 P.2d 1277 (Wyo.1999).

¶ 19 The only evidence of severance in this case is the fact that the Ayerses conveyed the surface to Stansberry in one deed and conveyed a portion of the water rights in another deed. At least one court has noted that a conveyance of the minerals and surface at the same time to the same party may not indicate a severance and instead may have simply been the form used to convey the surface and minerals where the parties never intended to sever the interests. *See Henley v. U.S.,* 184 Ct.Cl. 315, 396 F.2d 956, 963 (Ct.Cl.1968).

¶ 20 At least one Oklahoma statute, and a case interpreting it, suggest that water rights remain attached to the surface, although they may be leased as Deer Creek did in this case. Title 82 O.S.2001 § 1020.11 addresses the types of permits the Oklahoma Water Resources Board may issue for use of waters underlying Oklahoma lands. Subsection 1020.11(D) provides ". . . no permit shall be issued to an applicant who is not the surface owner of the land on which the well is to be located, or does not hold a valid lease from such owner permitting withdrawal of water from such basin or subbasin"[12] In *Unit Petroleum Co. v. Oklahoma Water Resources Bd.,* 1995 OK 73, 898 P.2d 1275, an oil producer challenged the Water Resources Board's denial of its application for a permit to use groundwater in oil drilling operations. The Board denied the permit because the oil producer did not own the surface and did not hold a lease permitting withdrawal of the water. The Oklahoma Supreme Court addressed only whether Subsection D could be applied retroactively to mineral interests severed before the effective date of the subsection. The court found the subsection would

---

11. A mineral deed which used the terms "mineral," "mineral-product," "mineral substance" and "all salt mineral waters" was held not broad enough to include subterranean waters in *Elkhorn Coal Corp. v. Yonts,* 262 S.W.2d 384 (Ky. App.1953).

12. The Oklahoma Statutes on stream water use provide for severance of water rights in certain

circumstances. 82 O.S.2001 § 105.22. However, no similar language is found in the Oklahoma Groundwater Laws, 82 O.S.2001 § 1020.1 to § 1020.22. "Groundwater" is "fresh water under the surface of the earth regardless of the geologic structure in which it is standing or moving outside the cut bank of any definite stream". 82 O.S.2001 § 1020.1(1).

have "prospective application with respect to all [oil and gas] mineral interests severed from the surface estate prior to the effective date of the statute's amendment,...." *Id.* at ¶ 9.

¶ 21 The general rule which emerges from these authorities is that water is presumed to go with a surface conveyance unless contrary intent is specifically and expressly stated. In this case, it is unclear that the water rights related to Stansberry's surface interest were severed simply because the water and surface were conveyed to him in separate deeds on the same date. Nothing in the record here shows that the Ayerses intended to sever the water rights: a conveyance of "surface only" does not expressly reserve water, and indeed, they expressly conveyed the water rights to Stansberry by mineral deed the same day. The bare fact that the Ayerses conveyed to Stansberry a percentage of the water estate related to a larger parcel than the surface acres they conveyed does not show intent to sever the water rights. And, Stansberry undertook no affirmative action during his ownership to express an intent to sever the water rights. Instead, he conveyed his interest by

quitclaim deed. Deer Creek asserts that if the water rights were severed, the doctrine of merger applies to join the water and surface estates when both were conveyed to Stansberry.[13]

¶ 22 However, we need not address the issue of merger here because Stansberry conveyed his interest to EAR in the Quit Claim Deed. "A quitclaim deed, made in substantial compliance with the provisions of this chapter, *shall convey all the right, title and interest of the maker thereof in and to the premises therein described.*" 16 O.S.2001 § 18 (emphasis added). If a grantor who executes a quitclaim deed intends to reserve or retain *any* interest in realty, such reservation should be expressly stated in a quit claim deed. *Anchor Stone & Material Co. v. Pollok*, 1959 OK 154, 344 P.2d 559, 561 (emphasis added). Because water must be specifically and expressly reserved from a deed, and because a quitclaim deed conveys all of the grantor's interest in the property, Stansberry's execution of a quitclaim deed without reservation of the water conveyed Stansberry's 39% water interest in the 54.28 acres to EAR.[14]

---

13. The elements required for merger of estates are: 1) two or more distinct estates of greater and lesser rank; 2) a meeting of the estates in one person; 3) coincidence of the time of meeting; 4) an absence of intervening estates; and 5) holding the estates in the same right. 31 C.J.S., *Estates*, § 156. In *Paris Bank of Texas v. Custer*, 1984 OK 5, 681 P.2d 71, the Oklahoma Supreme Court explained the evolution away from the common law's strict application of merger to a more equitable application dependent on the intent of the party in whom both estates meet. There is a split of authority on the issue of whether a surface estate and a mineral estate can merge. *See Humphreys–Mexia Co. v. Gammon*, 113 Tex. 247, 254 S.W. 296, 300 (1923) (*held*, severed minerals which constitute a fee simple interest may not merge with the fee simple interest in the surface because fee simple estates are equal and therefore cannot merge); *Sharp v. Fowler*, 248 S.W.2d 322, 324 (Tex.Civ.App.1952) (*held*, where surface and minerals were conveyed separately to one party, the two interests merged and were later conveyed together in a deed which described the surface and did not reserve the minerals); *Hunter v. Rosebud County*, 240 Mont. 194, 783 P.2d 927 (1989) (*held*, a conveyance of previously excepted mineral estate to the owner of the remaining estate merged the two estates); *Com., Marine Resources Commission v. Forbes*, 214 Va. 109, 197 S.E.2d 195 (1973) (*held*

where a severed riparian water right and the surface right are owned by the same person, the estates merge). As we note elsewhere in this opinion, the Oklahoma Supreme Court has held that water is not considered a traditional mineral, so it is unclear whether an estate in water is equal to the surface estate in Oklahoma. "Merger is co-extensive with the interest merged, as in the case of joint tenants and tenants in common; and it is only to the extent of the part in which the owner has two several estates. An estate may merge for one part of the land, and continue in the remaining part of it." *Clark v. Parsons*, 69 N.H. 147, 39 A. 898, 899 (1897). Therefore, although Stansberry held 39% of the water rights to the entire quarter-section, he owned 54.28 acres of surface, so that if merger occurred, the effect would be to merge 39% of the water rights in the 54.28 acres with the surface estate.

14. A Texas decision supports this view. In *Graham v. Kuzmich*, 876 S.W.2d 446 (Tex.App. 1994), the parties agreed that Kuzmich owned 17 acres of surface which he bought by warranty deed. The dispute was over ownership of 15 acres of "class B water rights." The chain of title in *Graham* was complicated, but broadly the record showed that the 17 acres were conveyed by deed which expressly stated that the appurtenant water rights were included. The grantee

¶ 23 EAR therefore held 39% of the water rights to its 54.28 acres at the time it conveyed 40 acres to Medicine Lodge by Warranty Deed. And, a warranty deed conveys the whole interest of the grantor in the premises described. 16 O.S.2001 § 19. A deed must be construed most strongly against the grantor and most favorably to the grantee. *Porter v. Warner–Caldwell Oil Co.,* 1938 OK 330, 80 P.2d 252, 253, 183 Okla. 1. The cardinal rule in construing a deed is to ascertain the true intent of the parties. *Lahman v. Bassel,* 1962 OK 174, 373 P.2d 245, 248. The parties' intent must be discerned from the instrument itself, taking all of it together, and considering every part of it. *Id.* Only in cases of uncertainty may the court look to the surrounding facts and circumstances to determine the parties' intent *Thoma v. Coats,* 1952 OK 31, 240 P.2d 736, 737, 205 Okla. 688.

¶ 24 Appellees have presented some evidence that Stansberry and Medicine Lodge's agent agreed the water rights were not to be conveyed from EAR to Medicine Lodge. But, the Warranty Deed includes no express reservation of water rights.[15] This evidence shows a dispute of fact regarding whether the parties executed the Warranty Deed under a mutual mistake of fact. In the absence of fraud or mistake, a properly executed deed constitutes the parties' agreement and merges the parties' prior oral negotiations. *Anchor Stone, supra,* 344 P.2d at 561. *Twin Forks Ranch, Inc. v. Brooks,* 120 N.M. 832, 907 P.2d 1013 (Ct.App.1995), holds that a deed with no reservation of water rights may be reformed when mutual mistake based on lack of knowledge of appurtenant water rights exists at time of sale. That decision noted that reformation is not proper in the case of a unilateral mistake, and the grantor bears the risk of a unilateral mistake.

¶ 25 An action to reform a deed is equitable, and in the case of a mutual mistake of fact, equity will correct the mistake. *Cunnius v. Fields,* 1969 OK 8, 449 P.2d 703, 706; *Pangaea Exploration Corp. v. Ryland,* 2007 OK CIV APP 106, 173 P.3d 108. The record here shows that the 39% of the water rights in the 54.28 acres was conveyed to EAR in the Quit Claim Deed. EAR failed to specifically reserve the water rights in its Warranty Deed to Medicine Lodge. If trial reveals a mutual mistake of fact, then the Warranty Deed should be reformed to reflect the parties' intent that the water rights were reserved. Absent a mutual mistake of fact by EAR and Medicine Lodge in executing the Warranty Deed, the unambiguous document shows no specific reservation of the water rights and therefore the rights were conveyed with the surface.

¶ 26 The record shows that the trial court's decision is contrary to the language of Medicine Lodge's deed, which contained no reservation of water rights. If trial of the issues reveals the language of the conveyance was the result of a mutual mistake of fact, the Warranty Deed may be reformed. If trial shows no mutual mistake of fact, then the plain language of the Warranty Deed requires judgment in favor of Medicine Lodge (now Deer Creek).

---

later conveyed by warranty deed the 17 acres "together with 15" acres of water rights to Ortiz. Ortiz then gave a deed of trust to a bank as security for a loan. The deed of trust described the 17 acres but did not mention the water rights. After Ortiz defaulted on the loan, the bank purchased the 17 acres at a foreclosure sale and sold the property to Kuzmich. Neither the substitute trustee's deed nor the warranty deed to Kuzmich mentioned the water rights. The appellant sought to establish that the water rights had been severed and were not included in the deeds which did not mention the water rights. The appellate court noted the general rule that deeds are construed to convey the greatest estate possible. *Id.* at 448. Therefore, a deed which does not include an exception conveys the grantor's entire estate. *Id.* at 449. The court noted also that reservations and exceptions are construed against the grantor and must be set out in clear language. *Id.* The court concluded that the deeds which were silent as to water rights conveyed those rights. *Id.* Additionally, in *Hunter v. Rosebud County, supra,* the Montana Supreme Court rejected the argument that a quitclaim deed did not convey previously severed minerals where they were owned by the grantor at the time of the quitclaim deed.

15. The exception for mineral conveyances of record is not sufficient because it does not expressly include water and because the Mineral Deed conveyance of water rights to Stansberry was effectively extinguished to the extent Stansberry conveyed the water rights to EAR in the Quit Claim Deed.

REVERSED AND REMANDED FOR TRIAL.

MITCHELL, V.C.J., and BELL, J., concur.

